UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | : | |
|---|---|---|
| RICCI LATERRA, | : | |
|     Plaintiff | : | No. 3:17-cv-00057-VAB |
| | : | |
| V. | : | |
| | : | |
| GE BETZ, INC., and GENERAL ELECTRIC, CO., | : | |
|     Defendants | : | |
| | : | |

**RULING ON MOTION TO DISMISS OR STAY AND COMPEL ARBITRATION**

Ricci Laterra ("Plaintiff") filed this action against GE Betz, Inc. and General Electric Company (collectively, "Defendants"), who jointly employed Mr. Laterra before his employment ended in April 2015. Mr. Laterra claims that Defendants violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634, *et seq*., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-58, *et seq*., by discriminating against him on the basis of his age. Defendants have moved to dismiss the Complaint or stay proceedings and compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., arguing that Mr. Laterra agreed to participate in Defendants' alternative dispute resolution program when he was an employee.

For the reasons that follow, this motion is DENIED.

**I.    FACTUAL BACKGROUND**

Defendants' motion concerns the applicability of an arbitration agreement. The Court sets forth only those facts that are relevant to this inquiry.

1

Ricci Laterra lives in Niantic, Connecticut and is sixty-one years old. Compl., ECF No. 1, ¶ 2. Defendant General Electric Company ("GE") is a corporation licensed to conduct business in the State of Connecticut and located in Fairfield, CT.[1] *Id.* at ¶ 4. Defendant GE Betz, Inc. ("GE Betz"), a subsidiary of GE, is a corporation duly licensed to conduct business in the State of Connecticut with a corporate headquarters in Trevose, PA. *Id.* at ¶ 3. Mr. Laterra alleges that he worked for both Defendants as a Field Service Representative from 2005 until April 2015, when Defendants ended his employment. *Id.* at ¶ 25. Mr. Laterra alleges that his managers commended his "valued" and "successful" performance until 2013, when his supervisor, Mr. Darrin Conary, began to make "repeated" and "disparaging" comments about his age. *Id.* at ¶¶ 13-19. This treatment allegedly continued until April 2015, when Defendants fired him and replaced him with a much younger and less qualified employee. *Id.* at ¶¶ 20-24. In addition to challenging his termination, Mr. Laterra specifically alleges that "towards the end of [his] employment, Defendant[s] began subjecting Plaintiff to a hostile work environment." *Id.* at ¶ 24.

Defendants attach the Declaration of Jennifer Kozak. Ms. Kozak is an Executive Human Resources Business Partner for GE Betz, and in 2010 she worked as an "Executive Human Resources Manager for GE's Global Supply Chain." *See* Declaration of Jennifer Kozak ("Kozak Decl. II") at ¶ 2, Ex. A to Reply, ECF No. 25. Through Ms. Kozak, Defendants assert that, for the past seventeen years, they have "managed most United States employment disputes through Alternative Dispute Resolution [("ADR")] procedures." Declaration of Jennifer Kozak ("Kozak

---

[1] Since the filing of this case, GE has announced its intention to relocate from Fairfield, CT, to Boston, MA. *See* Ted Mann & John Kamp, *General Electric to Move Headquarters to Boston*, WALL ST. J. (Jan. 13, 2016, 8:35 PM), https://www.wsj.com/articles/general-electric-plans-to-move-headquarters-to-boston-1452703676 ("General Electric Co. will relocate its headquarters from leafy suburban Connecticut to Boston's busy waterfront . . . .").

Decl. I") at ¶ 4, Ex. to Mot. to Dismiss, ECF No 15-2. In 2009, Defendants assert, "GE began moving to a common ADR program called Solutions." *Id.* at 5. Defendants further claim that

> [i]n 2010, GE amended its Solutions ADR procedure to incorporate several legislative, judicial and agency developments concerning the content of alternative dispute programs with mandatory arbitration provisions. Prior to implementing the 2010 amendments, GE sent all impacted employees an email with a link to a My Learning training course where they could learn more about ADR and the 2010 amendments. The My Learning training explained the amendments.

Kozak Decl. I, 4. The amendments stated that "[c]overed employees and the Company are not allowed to litigate a Covered Claim in any court." 2010 Solutions ADR Procedure, Ex. B to Kozak Decl., at II.M ("Solutions Procedure"). It defined "Covered Claims [to] include all claims that arise out of or are related to an employee's employment or cessation of employment . . . where a court in the jurisdiction in question would otherwise have the authority to hear and resolve the claim under any federal, state or local municipal or county statute, regulation or common law." *Id.* at II.K. The Procedure expressly included "employment discrimination and harassment claims, based on, for example[,] age," as "covered claims." *Id.* It also stated that "[t]his Agreement shall be construed, interpreted and applied in accordance with the law of the State of New York, without regard to choice of law principles." *Id.* at II.W.

Any employee who consented to the Solutions Procedure would be bound to raise any "covered claim" using Defendants' dispute resolution procedures. Solutions Procedure, II.K. The Solutions Procedure required covered employees to engage in several levels of dispute resolution and mediation procedures before proceeding to arbitration. *Id.* In arbitration, employees and the Company agreed to an "expedited" discovery process in which parties could exchange discovery for ninety days. *Id.* at II.D.7.

Thirty days later, a jointly-selected arbitrator would proceed over a hearing on the employee's claims. *Id.* at II.D.11. The Procedure generally limited the length of the hearing to

3

two eight-hour days and the number of witnesses that the employee could call to testify, including experts, to five. *Id.* at III.D.16. Employees who agreed to be bound by the Procedure would also completely waive their right to a jury trial. *Id.* at II.M. Finally, covered employees would be bound by the Procedure's choice of law provision, *Id.* at II.W, would be unable to participate in any class action against Defendants, *id.* at II.M, and were required to keep the dispute resolution process "strictly private and confidential." *Id.* at III.D.6.

Defendants have attached as an exhibit a copy of a message signed by Sharon Daley, Vice President of Human Resources of GE Energy. *See* Daley Letter (undated), Ex. A to Kozak Decl. I. Defendants claim that all employees received this message by e-mail in 2010. *See* Kozak Decl., 6. Ms. Daley's letter described the 2010 amendments:

> Since DRP and Solutions were introduced, there have been several legislative, judicial and agency developments regarding the content of alternative dispute programs with mandatory arbitration provisions. These developments have led us to amend DRP and Solutions to ensure they continue to provide an effective and fair means of resolving workplace disputes early, quickly, and with limited disruption to employees' lives and the workplace.

Daley Letter. The letter also included a link that employees could access "for an explanation of ADR and these amendments." *Id.* The link led to an online training program called MyLearning ADR Training ("MyLearning Training"). *Id.*; Kozak Decl. I, ¶ 4.

Defendants claim that Mr. Laterra completed the MyLearning Training concerning the 2010 Solutions Procedure Amendments on December 30, 2010. Kozak Decl. I, ¶ 7. Defendants attach a copy of a "Certificate of Completion" generated by Mr. Laterra as an exhibit to Ms. Kozak's Declaration. They further assert that, "in completing the My Learning training, Mr. Laterra acknowledged that he was covered by the Solutions ADR Procedure." Kozak Decl. I, ¶ 7; Certificate of Completion, Ex. C to Kozak Decl. I.

According to Ms. Kozak, "[i]n order to access the web-based MyLearning Training concerning the 2010 Solutions Procedure amendments, Mr. Laterra was required to login electronically using his employee identification number and his self-designated password." Kozak Decl. II, ¶¶ 5-6. Ms. Kozak adds that the computer program would not have generated a certificate for Mr. Laterra unless he "personally accessed" the MyLearning Training site with his employee designation number and personal password. *Id.* at ¶ 6 ("The Certificate of Completion certifying that Mr. Laterra successfully completed the 2010 Solutions Procedure amendments training would only have been generated by the MyLearning Training module if Mr. Laterra had personally accessed the MyLearning Training utilizing his employee identification number and his self-designated password and then proceeded to successfully complete the training module concerning the 2010 Solutions Procedure amendments."). The Certificate includes one sentence of text, stating that Mr. Laterra "has successfully completed Solutions and DRP Procedure Amendment." Certificate, Ex. C to Kozak Decl. Neither Ms. Kozak's affidavit nor the supporting exhibits show what documents were provided during the training or the precise language Mr. Laterra reviewed in the training.

Mr. Laterra, in turn, argues that he has "no recollection" of receiving an e-mail from Ms. Daley, clicking on a link to complete the MyLearning Training, completing the training, or seeing the 2010 amendments to Solutions. Laterra Decl., Ex. A to Opp. Mem., ¶¶ 4-6. He also asserts that he thinks that he "would have remembered being asked to agree to a policy which required [him] to arbitrate any claims against GE, and that [he] would not have agreed to accept such a policy." *Id.* at ¶ 8.

5

## II. STANDARD OF REVIEW

"The FAA creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)); *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (affirming that a claim under the Age Discrimination in Employment Act could be subject to compulsory arbitration when affected employee signed a securities registration form containing an arbitration agreement). The Second Circuit has observed that the Act "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution" and "calls for the application, in state as well as federal courts, of federal substantive law regarding arbitration." *In re Am. Exp.*, 672 F.3d at 128. Despite this policy, arbitration "is a matter of consent, not coercion," *JLM Inds. v. Stolt–Neilsen*, SA, 387 F.3d 163, 171 (2d Cir.2004) (internal quotation omitted), and "federal law does not require parties to arbitrate when they have not agreed to do so." *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir.1995).

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In this Circuit, courts follow a two-part test to determine whether claims are subject to arbitration considering "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp.*, 672 F.3d at 128.

In the context of a motion to compel arbitration brought under the FAA, courts apply "a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also McAllister v. Conn. Renaissance Inc.*, No. 3:10cv1488(WWE), 2011 WL 1299830, at *3 (D.Conn. Apr. 5, 2011) (applying the same standard in the context of a motion to compel arbitration under an employment arbitration agreement of federal statutory claims, including a Title VII claim). The party seeking an order compelling arbitration must "substantiate [its] entitlement [to arbitration] by a showing of evidentiary facts" that support its claim that the other party agreed to arbitration. *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995). "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Id*. If the evidence suggests a genuine issue of material fact, the district court must summarily proceed to trial. *Bensadoun*, 316 F.3d at 175 (citing 9 U.S.C. § 4).

## III. DISCUSSION

The present dispute primarily concerns the first question in this Court's two-part inquiry under the FAA: "whether the parties have entered into a valid agreement to arbitrate." *In re Am. Exp.*, 672 F.3d at 128. Defendants argue that the 2010 amendments to the Solutions Procedure constituted an enforceable agreement to arbitrate with Mr. Laterra. Mr. Laterra challenges the enforceability of the agreement, arguing that he did not assent to its terms.

To decide whether a valid arbitration agreement exists, the court looks to the "ordinary state-law principles that govern the formation of contracts" under the law of the state governing the contract. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The parties also disagree about which state's law the Court should apply when answering this question.

7

Defendants argue that the Court should apply New York law, in accordance with the choice-of-law provision in the 2010 Solutions amendment, Reply, 2, while Mr. Laterra argues that Connecticut law should govern the question of the contract's enforceability, Opp. Mem., 5.

For the reasons that follow, the Court agrees with Mr. Laterra. As an initial matter, Connecticut law should be used to assess whether the parties agreed to arbitrate. Second, the Court concludes, applying Connecticut law, that Defendants have not provided the facts necessary to determine that the arbitration agreement is enforceable.

### A. Choice of Law

The Second Circuit has observed that "[t]he validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." *Fin. One. Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005). This is logical, because "[a]pplying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (eventually declining to "resolve this typically thorny choice-of-law question, because both Connecticut and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term."); *see also Kulig v. Midland Funding, LLC*, 2013 WL 6017444, at *3 (S.D.N.Y. Nov. 13, 2013) (quoting the above language); *but see Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004), *cert. denied sub nom.*, 544 U.S. 1044 (2005) ("[A] choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract.") (citation omitted).

In *Motorola*, which Defendants cite, plaintiffs Motorola and Nokia entered into financing agreements with non-party companies Telsim and Rumeli Telefon. *See Motorola*, 388 F.3d at 43. Each agreement provided that it would be governed by and construed in accordance with Swiss law. *Id.* Both of the non-party companies were controlled by the Uzan family of Turkey, who were defendants in the action, but not signatories to the agreement. *See id.* at 43, 49. Defendants sought to compel arbitration, but asserted that federal common law controlled issues of arbitrability, despite the choice-of-law clause. *Id.* at 50. The court honored the choice-of-law clause and applied Swiss law when assessing whether the plaintiffs could be held to the arbitration clause, observing that "if defendants wish to invoke the arbitration clauses in the agreements at issue, they must also accept the Swiss choice-of-law clauses that govern those agreements." *Id.* at 51.

Unlike the defendants in *Motorola*, Mr. Laterra seeks to avoid the choice of law clause because he challenges the enforceability of the agreement in its entirety. *Motorola*'s holding, which rested on the assumption that "the parties have chosen the governing body of law," therefore is less applicable here. *Id.* Furthermore, it is logical to treat the validity of the contractual choice-of-law clause "as a threshold question" to be decided using the choice of law rules of the "relevant forum," in this case Connecticut. *Financial One*, 414 F.3d at 332. This approach is most consistent with the approach the courts in this Circuit generally take when deciding an issue of contract formation. *See*, *e.g.*, *Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 591 (S.D.N.Y. 2001), *aff'd*, 306 F.3d 17 (2d Cir. 2002) ("Plaintiff's claims arise under this Court's federal question jurisdiction. Hence, I would ordinarily refer to federal choice-of-law rules. However, my determination of the instant motion involves a question of state law: was a contract formed? Therefore, in determining which state's law to apply to this question, I

find it appropriate to rely upon the forum state's choice-of-law rules rather than the federal choice-of-law rules."); *Follman v. World Fin. Network Nat'l Bank*, 721 F.Supp.2d 158, 162 (E.D.N.Y. 2010) ("To determine which state's law to apply to the issue of contract formation, a federal court sitting with federal question jurisdiction looks to the choice-of-law doctrine of the forum state.").

In any event, the Court can take further guidance from the Second Circuit and avoid this "typically thorny choice-of-law question," *Schnabel*, 697 F.3d at 118, because both Connecticut and New York's choice of law provisions would suggest that Connecticut law should govern.

Applying Connecticut's "choice-of-law rules governing the effectiveness of such clauses," *Financial One*, 414 F.3d at 332, the Court would not apply New York law to this dispute. In Connecticut, "parties to a contract generally are allowed to select the law that will govern their contract, unless either: (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Elgar v. Elgar*, 238 Conn. 839, 850 (1996) (quoting 1 Restatement (Second), Conflicts of Law § 187); *Bank of Am., N.A. v. Klein*, No. 3:10-CV-987 JBA WIG, 2012 WL 5286962, at *3 (D. Conn. Oct. 23, 2012) (articulating the same rule); *see also* Restatement (Second) of Conflict of Laws § 187 (1971) (providing that a choice-of-law provision will not be enforced where "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or "the application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the

applicable law in the absence of an effective choice of law by the parties."). Connecticut courts also use Connecticut law to determine whether a choice-of-law clause resulted from an "express choice [that was] made in good faith." *Id.* at 848; *see also Halling v. Jetseal, Inc.*, No. CV010446481S, 2001 WL 34093942, at *1 (Conn. Super. Ct. June 5, 2001) (using Connecticut law to determine whether parties had agreed to a choice-of-law provision selecting Washington law).

Connecticut choice-of-law principles would therefore apply Connecticut law for two reasons. First, Mr. Laterra claims he did not make an express, good faith agreement to the forum selection clause, and the Court must assess this argument using Connecticut law. *Halling*, 2001 WL 34093942, at *1. Second, New York has "no substantial relationship" to this dispute. In *Elgar*, the choice of law clause was valid because the plaintiff was a New York resident, "conducted many of her affairs in New York," and agreed to the contract in New York. *Id.* at 851. Considering these factors, and consistent with rulings, such as *Elgar*, there are no discernible connections to New York that would make the applicability of New York contract law appropriate.

Indeed, under New York's choice of law provisions, the Court would not necessarily apply New York law to the underlying dispute about the validity of the contract. In New York, a choice-of-law clause is presumptively valid, but "the chosen law [must] bear[] a reasonable relationship to the parties or the transaction." *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498 (2006); *Madden v. Midland Funding*, LLC, No. 11–CV–8149 (CS), 2017 WL 758518, at n. 7 (S.D.N.Y. Feb. 27, 2017) (emphasizing that this standard was "recently articulated by the New York Court of Appeals"). Courts "have looked to the location of the following factors: the parties' negotiation of the agreement; performance under the agreement[;]

11

the parties' places of incorporation; the parties' principal places of business; and the property that is the subject of the transaction." *Madden*, 2017 WL 758518, at *9; *see also McPhee v. Gen. Elec. Int'l, Inc.*, 426 F. App'x 33, 34–35 (2d Cir. 2011) (deriving a "reasonable relationship" to New York from several factors, including the forum selection clause, the defendant's "substantial presence in New York," the defendant's cooperation with a vendor in New York, and the fact that the decedent's "paychecks . . . originated from New York.").

In this case, both Defendants are located outside of New York, and the record does not contain evidence that either was incorporated there. Mr. Laterra lived and worked in Connecticut, and would have entered the alleged contract with Defendants in Connecticut. New York law does not bear any relationship—neither a "reasonable," *Welsbach*, 7 N.Y.3d at 629, nor a "substantial" one, *Elgar*, 238 Conn. at 850—to the parties and the transaction at issue here. As a result, the arbitration agreement's choice-of-law clause, which requires the application of New York law, would not control the resolution of the dispute about whether the parties agreed to arbitrate.

### B. Validity of Arbitration Agreement

Under Connecticut law, "for an enforceable contract to exist, the court must find that the parties' minds had truly met." *Fortier v. Newington Group, Inc.*, 30 Conn. App. 505, 510, 620 A.2d 1321, *cert. denied*, 225 Conn. 992 (1993) (adding that "an agreement must be definite and certain as to its terms and requirements."). Additionally, "[f]or a promise to be enforceable against the promisor, the promisee must have given consideration for the promise, defined as 'a benefit to the party promising, or a loss or detriment to the party to whom the promise is made.'" *Deleon v. Dollar Tree Stores, Inc.*, No. 3:16-CV-00767 (CSH), 2017 WL 396535, at *2 (D.

Conn. Jan. 30, 2017) (citing *Helenese v. Oracle Corp.*, No. 09-351, 2010 WL 670172, at *3 (D. Conn. Feb. 19, 2010)).

The same principles apply to contract modification. For a modification of a contract to be valid, "there must be mutual assent to the meaning and conditions of the modification and the parties must assent to the same thing in the same sense . . . if they are to vary the contract in any way." *Manzin v. United Bank & Trust Co.*, 6 Conn. App. 513, 516, 506 A.2d 169, 171 (1986); *Torosyan v. Boehringer Ingelheim Pharm., Inc.*, 234 Conn. 1, 17, 662 A.2d 89, 98 (1995) (for an employer to "modif[y] the preexisting terms of employment, the plaintiff must have consented to that modification.").

"To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties." *L & R Realty v. Connecticut National Bank*, 53 Conn. App. 524, 535, 732 A.2d 181 (1999). A party, therefore, "cannot actually assent to an offer unless [she] knows of its existence." *Schnabel*, 697 F.3d at 123 (citing 1 WILLISTON ON CONTRACTS § 4:16); *Carbone v. Atl. Richfield Co.*, 204 Conn. 460, 472, 528 A.2d 1137, 1143 (1987) (employee manual was not incorporated into employment contract because the plaintiff "was not aware of the manual before or during his employment, and therefore did not rely on its provisions at any time."); *Manley v. Blue Cross/Blue Shield of Connecticut*, No. CV 910322213S, 1996 WL 532506, at *4 (Conn. Super. Ct. Sept. 10, 1996) ("[I]f a discharged employee was completely unaware of the personnel manual or any of the policies effectuated by it then it would in fact be difficult to find that a personnel manual could be the basis of a breach of contract claim . . ."). "A person can assent to terms even if he or she does not actually read them, but the 'offer [must nonetheless] make clear to [a reasonable] consumer' both that terms are being presented and that they can be adopted through the conduct

that the offeror alleges constituted assent." *Schnabel*, 697 F.3d at 123 (citing *Specht*, 306 F.3d at 29).

Defendants argue that Mr. Laterra "impliedly agreed to comply with [the arbitration clause] by continuing his employment after receiving notice of it in the MyLearning Training." Reply Mem., 5. The parties' briefs highlight a disagreement among courts in this District about whether an at-will employee can consent to a modification of his employment contract by continuing to work. Def.'s Reply, 5; Opp. Mem., 11 (citing *Torosyan*, 234 Conn. at 18-19) ("When an employer issues an employment manual that substantially interferes with an employee's legitimate expectations about the terms of employment ... the employee's continued work after notice of those terms cannot be taken as conclusive evidence of the employee's consent to those terms").[2] The Court need not reach this issue today, because Defendants have not demonstrated that they notified Mr. Laterra of the precise nature of the proposed modification to his employment contract. Even if the Court held that Mr. Laterra could manifest his consent to the 2010 amendments by continuing to work for Defendants, the record would need to show that Mr. Laterra understood the contractual modification. In this case, those critical facts are missing.

---

[2] Some courts in this District have concluded that *Torosyan* does not apply to arbitration agreements. *See Fahim v. CIGNA Inv., Inc*., No. 3:98-cv-232 (PCD), 1998 WL 1967944, at *3 (D.Conn. Sept.10, 1998) (distinguishing *Torosyan* where employee was at-will and enforcing arbitration policy accepted by continued employment on the basis that the employee had no "legitimate expectation about the terms of employment, i.e. to be free of the arbitration policy") (internal citations omitted); *Pomposi v. GameStop, Inc.,* No. CIV.A 3:09-CV-340 (VLB), 2010 WL 147196, at *5 (D. Conn. Jan. 11, 2010) (following *Fahim* and further distinguishing the case because the plaintiff "had also signed an acknowledgment in which he expressly agreed to resolve claims under C.A.R.E.S."); *Carey v. Connecticut Gen. Life Ins. Co*., 93 F. Supp. 2d 165, 169 (D. Conn. 1999) (noting that the plaintiff's reliance on *Torosyan* was "misplaced" because the case "did not address the modification of an employment arrangement exclusively within an at-will context," but concluding regardless that the plaintiff had manifested her assent to the arbitration clause other actions in addition to her continued employment); *but see Phillips v. CIGNA Investments, Inc*., 27 F. Supp. 2d 345, 353 (D. Conn. 1998) ("After a thorough analysis of relevant caselaw, we . . . respectfully disagree with the result reached in *Fahim*."); *McAllister v. East,* 611 F. App'x 17, 19 (2d Cir. 2015) (citing *Torosyan* to conclude that even when an employment agreement is implied, "to become enforceable . . ., proposed modifications, like the original offers, must be accepted[,]" and reasoning that the plaintiff's decision to continue working was not determinative but "relevant to determining whether . . . she consented") (internal citations omitted).

14

Defendants propose that Mr. Laterra received notice of the arbitration clause in the MyLearning Training program. Ms. Kozak's affidavit attaches a certificate stating that Mr. Laterra "personally accessed" the My Learning training program and asserts that "by completing the My Learning Training, Mr. Laterra acknowledged that he was covered by the Solutions ADR Procedure." Kozak Decl. I, ¶ 7.

Defendants, however, have not demonstrated that the MyLearning Training gave Mr. Laterra notice of the arbitration clause, such that he could assent—impliedly or manifestly—to its terms. The language of the MyLearning Training is not in the record. Furthermore, while Defendants provide the Solutions Procedure as an exhibit to Ms. Kozak's affidavit, they do not make clear whether the text of the Solutions Procedure available to employees as part of the MyLearning Training. Because "there must be mutual assent to the meaning and conditions of [a contract] modification," *Manzin*, 6 Conn. App. at 516, the Court cannot conclude that Mr. Laterra agreed to the arbitration clause.

Defendants urge the Court to follow several cases in this District upholding arbitration agreements in the employment context. *See* Opp. Mem., 6 (citing *Pingel v. Gen. Elec. Co.*, No. 3:14-CV-00632 (CSH), 2014 WL 7334588 (D. Conn. Dec. 19, 2014); *Deleon*, 2017 WL 396535, at *3). In each case, however, the defendant employer gave the plaintiff the opportunity to agree explicitly to the terms of the arbitration clause.

In *Pingel*, the Solutions arbitration policy was a "condition of [the plaintiff's] new employment," not a unilaterally imposed contract modification. *Pingel,* 2014 WL 7334588, at *1. While she did not receive a hard copy of the agreement that included the arbitration clause, Ms. Pingel signed a form indicating that she "acknowledge[d] that the offer of employment made to [her was] contingent upon meeting all employment requirements," including "[her] review and

15

agreement to the Solutions Procedure." *Id.* It further stated that she agreed "to resolve disputes in accordance with the terms of the [] Procedure" and "to waive the right to pursue Covered Claims . . . against [Defendant] in Court." *Id.*

The Acknowledgment Form in *Pingel* also specified that the plaintiff's "signature . . . constitutes acknowledgment of [her] receipt and review of a copy of and agreement to the Solutions Procedure." *Id.* Finally, GE also sent an e-mail to the plaintiff that included an offer letter as well as an invitation to visit its "Transfer Offer" website "to review important GE policies," including the Solutions Procedure. Daley Letter; Kozak Decl. ¶ 6.

Similarly, in *Deleon*, the plaintiff "accessed the Arbitration Agreement on two occasions" and was given the right to opt out of the program, as well as "materials . . . explaining the right to opt-out of the program [and making] clear that associates would be bound by the Arbitration Agreement if they did not opt-out." *Deleon*, 2017 WL 396535, at *3.

In short, in those cases, the records contained clear indications of the employees' assent to the arbitration agreement. Here, the Court cannot determine whether Mr. Laterra was informed that participating in the training would constitute agreement to the Solutions Procedure, whether he was given the right to opt out of the agreement, or whether he was informed of the consequences of disagreeing with it. Without the training's text, the Court cannot evaluate Defendants' argument that Ms. Daley's e-mail put Mr. Laterra on inquiry notice of the arbitration clause by describing the 2010 amendments and linking to the MyLearning Training. *See Schnabel*, 697 F.3d at 120 ("[W]here there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent[, but] an exception to this

16

general rule exists when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.").

Accordingly, the Court cannot determine whether a "reasonable person" would be likely to understand that he or she was agreeing to a contract when clicking through the MyLearning Training, nor can it determine whether the training made Mr. Laterra aware "that disputes arising between him [and Defendants] were to be resolved by an alternative dispute resolution procedure." *Schnabel*, 697 F.3d at 126. Because Defendants do not provide "evidentiary facts" showing that the parties agreed to arbitrate, *Oppenheimer*, 56 F.3d at 358, their motion is denied.

## IV. Conclusion

For the reasons stated above, Defendants' motion to dismiss is DENIED.

SO ORDERED at Bridgeport, Connecticut this 14th day of August.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE